# Nos. 23-4509 (L) & 23-4566 (cross-appeal)

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee-Cross-Appellant,*

v.

## RUSSELL LUCIUS LAFFITTE,

*Defendant-Appellant-Cross-Appellee.*

On Appeal and Cross-Appeal from the United States District Court for
the District of South Carolina, No. 9:22-cr-00658-RMG-1

## REDACTED RESPONSE OF CROSS-APPELLEE AND REPLY BRIEF OF APPELLANT

Mark C. Moore
Michael A. Parente
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Phone: 803.771.8900
mmoore@maynardnexsen.com
mparente@maynardnexsen.com

William W. Wilkins
MAYNARD NEXSEN PC
104 S. Main Street, Suite 900
Greenville, SC 29601
Phone: 864.370.2211
bwilkins@maynardnexsen.com

John C. Neiman, Jr.
MAYNARD NEXSEN PC
1901 Sixth Avenue N., Suite 1700
Birmingham, AL 35203
Phone: 205.254.1000
jneiman@maynardnexsen.com

*Counsel for Defendant-Appellant-Cross-Appellee*
*Russell Lucius Laffitte*

# TABLE OF CONTENTS

Table of Authorities ....................................................................................... iii

Note on Redactions ........................................................................................ 1

Introduction to Response and Reply ........................................................ 2

Additional Issue Presented by Cross-Appeal ........................................ 6

Response to Cross-Appeal Statement of Case ....................................... 7

Summary of the Argument ......................................................................... 11

Argument ....................................................................................................... 15

   I.    The district court erred when it replaced Juror #88, who reported suffering anxiety ████████████ ████████████ ............................................................... 15

       A.    The judge's replacement of Juror #88 violated Laffitte's right to a unanimous and impartial jury ......... 16

       B.    The judge's replacement of Juror #88 also violated Laffitte's right to be present at all stages of trial ........... 23

   II.    The district court erred when it replaced Juror #93, whose notes said she needed an antibiotic and was feeling "pressured to change my vote" ................................................. 30

       A.    The testimony of Juror #93 on these matters is admissible ................................................................... 31

       B.    The judge's replacement of Juror #93 was error that independently requires reversal .................................... 40

   III.   The district court erred when it excluded evidence demonstrating Government witnesses' bias .......................... 45

   IV.   The district court erred when it denied Laffitte's motion for judgment of acquittal on Counts 2 and 3 .......................... 55

   V.    The cross-appeal is meritless and moot ................................... 62

Conclusion ...................................................................................................... 65

Certificate of Compliance ........................................................................... 67

Certificate of Service ................................................................................... 68

i

# TABLE OF AUTHORITIES

### JUDICIAL DECISIONS

*Brady v. United States,*
      397 U.S. 742 (1970)...................................................................35, 40

*Chiarella v. United States,*
      445 U.S. 222 (1980)........................................................... 61

*Cola v. Reardon,*
      787 F.2d 681 (1st Cir. 1986)...................................................58, 61

*Davis v. Alaska,*
      415 U.S. 308 (1974)........................................................... 52

*Dunn v. United States,*
      442 U.S. 100 (1979)........................................................... 58

*Faretta v. California,*
      422 U.S. 806 (1975)........................................................... 28

*Johnson v. Zerbst,*
      304 U.S. 458 (1938)........................................................... 25

*Quinn v. Haynes,*
      234 F.3d 837 (4th Cir. 2000)........................................................... 50

*Tanner v. United States,*
      483 U.S. 107 (1987)........................................................... 33

*United States v. Acker,*
      52 F.3d 509 (4th Cir. 2005)........................................................... 34

*United States v. Brown,*
      823 F.2d 591 (D.C. Cir. 1987) .................................................18, 27

*United States v. Burfoot,*
      899 F.3d 326 (4th Cir. 2018)........................................................... 54

ii

*United States v. Elbaz,*
  52 F.4th 593 (4th Cir. 2022)...................................................... 26

*United States v. Hill,*
  322 F.3d 301 (4th Cir. 2003)...................................................... 53

*United States v. Kemp,*
  500 F.3d 257 (3d Cir. 2007)....................................................18, 19

*United States v. McGill,*
  815 F.3d 846 (D.C. Cir. 2016) .................................................... 21

*United States v. Millender,*
  970 F.3d 523 (4th Cir. 2020)...................................................... 57

*United States v. Olano,*
  507 U.S. 725 (1993)................................................................... 45

*United States v. Ozomaro,*
  44 F.4th 538 (6th Cir. 2022)...................................................... 18

*United States v. Runyon,*
  707 F.3d 475 (4th Cir. 2013)...................................................28, 41

*United States v. Symington,*
  195 F.3d 1080 (9th Cir. 1999) .................................................... 19

## STATUTES AND ORDINANCES

18 U.S.C. § 1343................................................................... 59

18 U.S.C. § 1344................................................................... 59

18 U.S.C. § 3612................................................................... 63

## RULES OF COURT

FED. R. CRIM. P. 24................................................................ 41

FED. R. EVID. 103...........................................................46, 50, 52

FED. R. EVID. 606.........................................................32, 33, 34, 36

iii

Fed. R. Evid. 803.................................................................... 53

## NOTE ON REDACTIONS

This Response and Reply redacts sealed materials the same way previous briefs have, marking in <mark style="background-color: yellow">yellow</mark> the sealed materials whose admissibility the Government concedes and, in <mark style="background-color: cyan">blue</mark>, the sealed juror affidavits whose admissibility is disputed by the Government.

1

## INTRODUCTION TO RESPONSE AND REPLY

The Government's response brief is a remarkable exercise in obfuscation. It is 25,994 words long—10,694 more than the Rules normally allow. Yet it fails to quote or even acknowledge some of the most important words from this record that transparently require a new trial of this case:

Those are the words Juror #88 spoke to the judge in their *in camera* interview during the break in jury deliberations—after which he replaced her, outside the parties' presence, due to the anxiety she had expressed. The transcript of this interview shows that Juror #88 told the judge So this transcript, which the Government's brief ignores, demonstrates that the judge committed a paradigmatic violation of Laffitte's Sixth Amendment rights when he dismissed her on this ground.

It is nothing short of stunning, then, that the Government's response brief has proceeded as if this exchange had never occurred and this transcript had never been made. The Government's statement of the case does not summarize the interview or cite the transcript even once. *See* U.S. Br. 29-32. Nowhere in the brief's 25,994 words is Juror #88's statement that she was feeling this anxiety ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ Not a single one of the 111 pages acknowledges that this juror told the judge, ▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓ Never does the brief confront the reality that when the judge announced that he had dismissed her outside the parties' presence, ▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓ JA2283.

On all these fronts, the Government's silence is deafening. The Government "consent[ed]," as the judge put it, to his "creating a record to question the juror." JA2279. The admissibility of the statements Juror

#88 made during her *in camera* interview is not in dispute, and the Government concedes that Laffitte's Sixth Amendment claim "as to Juror 88 is preserved." U.S. Br. 46. The Government's argument on this Sixth Amendment issue rises and falls on its assertion that Juror #88's anxiety was, in the Government's words, "wholly independent of her views of the evidence." U.S. Br. 75.

That is far from the only flaw in the Government's arguments, and at this point the Government should be confessing error, consenting to a retrial, and agreeing to Laffitte's immediate release from prison in the meantime. The Government instead has filed a 111-page response and taken a meritless cross-appeal. In defending these convictions, the Government sows confusion at every turn—attacking straw-man arguments Laffitte has not made, asking for affirmance on previously unraised grounds, and asserting waiver and forfeiture on virtually all fronts. The Government's cross-appeal, in turn, accuses the judge of not making a finding that he in fact made, and asks this Court to reverse a ruling the Government admits it "did not object to" below. U.S. Br. 104.

4

The facts that should have led to the Government's confession of error get buried beneath the 25,994-word avalanche in its brief. But its explanation for why it has filed an obviously problematic cross-appeal speaks volumes about the motives for all its decisions in this case. The Government is cross-appealing that ruling—regarding an interstitial, restitution-related issue it did not contest below—because Alex Murdaugh's story and this case, in the Government's words, have "attracted substantial attention from across the world." U.S. Br. 109.

In the midst of a high-profile prosecution, that is to say, the Government has lost all perspective about what matters most. The Government is right when it says the district court committed "error" that "seriously affects the fairness, integrity, and public reputation of judicial proceedings." U.S. Br. 109. But the Government is wrong about what this error was. The judge's actions during jury deliberations were contrary to the basic premises of our legal system. A defendant who maintains his innocence—                                        —has been wrongly convicted and imprisoned. A new trial must be held for reasons that are straightforward and clear.

5

## ADDITIONAL ISSUE PRESENTED BY CROSS-APPEAL

**V. Interest on restitution.** If this Court does not grant Laffitte's request for a new trial, has the Government established that this Court must reverse the judge's determination that interest on the restitution judgment would be waived because Laffitte did not have the means to pay it, on the premise that the judge's determination was plain error that affects the Government's substantial rights and seriously affects the fairness, integrity, and public reputation of judicial proceedings?

## RESPONSE TO CROSS-APPEAL STATEMENT OF CASE

The bulk of the statement of the case in the Government's brief is devoted to the issues raised by Laffitte's appeal. *See* U.S. Br. 3-34. In those pages the Government largely reiterates the closing argument it made to the jury—positing that a verdict of "guilty on all counts" was, in the Government's words, "the only conclusion supported by the evidence." U.S. Br. 1. The Rules of Appellate Procedure do not afford Laffitte enough words to respond point-by-point to that closing argument now, and doing so would not serve any productive purpose in the context of this appeal. The issues before the Court concern questions about the law.

As Laffitte's opening brief documented, he took the stand at this trial and testified that he did "not know in any way" that he was "helping facilitate the theft by Alex Murdaugh." *See* Laffitte Br. 3 (quoting JA1862-1863); *see also* Laffitte Br. 12 (quoting JA1894); Laffitte Br. 14 (quoting JA1901); Laffitte Br. 15 (quoting JA1923). To the extent his testimony was believed by the jury—and it by all appearances **was** believed

7

by the two jurors the judge dismissed—it established, as the jury instructions provided, "'a complete defense'" to all charges. Laffitte Br. 19 (quoting JA2259). At the retrial of this case, the Government will be free to make its closing argument again, but it will again be the jurors' role to assess Laffitte's credibility in general and the good-faith defense in particular. Having secured the dismissal of deliberating jurors ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮, the Government cannot ask this Court to take the jury's place and determine Laffitte's guilt or innocence for itself.

It is only in the final few paragraphs of its statement that the Government addresses the issue implicated by its cross-appeal. *See* U.S. Br. 34-35. A few additional points about the district court's ruling at issue there, waiving interest on the $3.5 million restitution judgment, warrant elaboration now.

First, the Presentence Investigation Report ▮▮▮▮▮▮▮▮▮▮

Second, there was significant discussion during the sentencing hearing about how these assets' lack of liquidity—as well as Laffitte's right to pursue an appeal—would affect his ability to cover the restitution judgment. The Government told the judge that it "intend[ed] to file motions to enforce the restitution judgment and may request that his assets be liquidated," and asked that "in the meantime" he "not be able to liquidate those assets without court approval." JA2854-2855. In response, the judge orally "enjoin[ed] the defendant from . . . liquidating or transferring" most of these assets. JA2856-2857. Counsel and the judge discussed the possibility that Laffitte would need to "seek[] resources that would be subject to restitution" for the purposes of pursuing "an effective appeal." JA2857. Defense counsel also noted that if Laffitte were to "liquidate" any of his "assets, he gets a substantial tax liability." JA2859. The judge

9

responded, "I understand the consequence of liquidation of taxes." JA2859.

Third, it simply is not the case that the district court found only that Laffitte did not have the ability to pay "a fine." U.S. Br. 35. The court also found, in its final judgment, that "the defendant does not have the ability to pay interest and it is ordered that . . . [t]he interest requirement is waived for the restitution." JA2644.

10

## SUMMARY OF THE ARGUMENT

**I.**  The Government mounts no adequate defense of the district court's replacement of Juror #88.

**A.**  The Government concedes that Laffitte preserved his claim that Juror #88's dismissal violated the Sixth Amendment and that the analysis is governed by the rule adopted by the other circuits. With those two concessions should have come a confession of error. With Juror #88 telling the judge she was feeling anxious ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the Government has no serious argument that Juror #88's request was independent of her views of the merits.

▓▓▓▓▓▓▓ With the improperly reconstituted jury convicting Laffitte less than an hour later, the Government does not have a serious argument that her dismissal was harmless beyond a reasonable doubt.

**B.**  The Government has no basis for asserting that Laffitte waived his Fifth Amendment right to be present or that the judge made his decision to dismiss Juror #88 in Laffitte's presence. "[C]onsent to me creating a record to question the juror" does not mean "[C]onsent to me sum-

11

marily replacing her." JA2279. "[T]ake action" does not mean "take action 'on the juror's request to be replaced.'" JA2281; JA2410. If Laffitte's counsel had been present, they could have pointed out that her anxiety was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ So the Government does not have a valid argument that this Fifth Amendment violation was harmless beyond a reasonable doubt.

**II.** The Government also mounts no adequate defense of the district court's replacement of Juror #93.

**A.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**B.** Defense counsel's purported "agree[ment]" with Juror #93's dismissal was not "knowing," and the judge's decision was reversible error. The few minutes it would have taken to call her friend did not render her unable to perform her duties under Federal Rule of Criminal Procedure

12

24. The Government cites no language in the record—because there is none—documenting counsel agreeing ahead of time that Juror #93 would be replaced outside their presence in violation of the Fifth Amendment. Laffitte's Sixth Amendment rights were violated because it was reasonably possible, based on her second note's statement that she was feeling pressured to change her vote, that her first note was meant to secure an audience with the judge to express similar concerns.

**III.**  The Government also does not adequately defend the district court's exclusion of the evidence showing that the directors who testified against Laffitte were biased because they disagreed with him on selling the bank. The record shows that counsel adequately explained the substance of the testimony and the memo that evidenced these witnesses' bias. The district court's ruling that a party cannot impeach witnesses with extrinsic evidence of bias was incorrect. In light of the Government's choice to present a complex case that included the testimony of all four of these directors, it cannot plausibly maintain that this evidence of their bias would have confused the jury or unnecessarily complicated the trial.

13

**IV.** The Government's arguments against judgment of acquittal on Counts 2 and 3 are similarly unavailing. The Government has not previously maintained that these convictions can be preserved on an aiding-and-abetting theory, and it cannot change theories now. Regardless, the Government does not point to any evidence that the two specific transactions at issue were induced by fraud. No evidence supports the Government's argument that these transactions happened due to a "misrepresentation" by Laffitte that he had authority to disburse funds for James or Donna Badger. The Government's new theory that Laffitte made a "misrepresentation" to the bank each time he negotiated a check at Murdaugh's request comes far too late and is transparently wrong.

**V.** The Government's decision to cross-appeal a ruling it did not contest below is confounding, especially this ruling on restitution. The district court's judgment found that Laffitte did not have the ability to pay interest on restitution, and the record supported the court's conclusion. Several rulings by the district court seriously affected the fairness, integrity, and public reputation of the judicial proceedings in this case, but this ruling was not among them.

14

## ARGUMENT

## I.   The district court erred when it replaced Juror #88, who reported suffering anxiety ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

The first ruling Laffitte challenges is the judge's dismissal of Juror #88, which Laffitte's opening brief explained "is reason enough, by itself, to reverse." Laffitte Br. 43. The proper resolution of this issue is straightforward, but the Government's brief has done much to obscure it. The Government has started not with its response on this issue, but instead with a newly framed, separate issue concerning the juror affidavits, which Laffitte's opening brief observed "this Court does not need to consider" until it addresses Juror #93. Laffitte Br. 56 n.*. When the Government finally does address the judge's dismissal of Juror #88, it merges its response on that point with its arguments about Juror #93 and makes its arguments about Juror #93 first—even though Laffitte presented these issues separately, argued them separately, and explained that these two jurors' dismissals created independent reasons to reverse. *Compare* Laffitte Br. 43-57 (argument on Juror #88), *and* Laffitte Br. 57-66 (argument on Juror #93), *with* U.S. Br. 44-76 (alternating between arguments on Juror #93 and Juror #88).

15

The Government's rearranging and reframing of its argument has made its specific position on Juror #88 more difficult to discern, but perhaps the Government has taken that tack on purpose. On this issue, it turns out that the Government has exceedingly little of substance to say. Laffitte has explained that the judge's dismissal of Juror #88 violated both his Fifth Amendment right to be present and his Sixth Amendment right to a unanimous and impartial jury, and the Government has not offered adequate responses on either front. Because the Government acknowledges that the Sixth Amendment claim is properly before this Court—while maintaining, erroneously, that the Fifth Amendment claim is not—this Reply addresses the Sixth Amendment claim first.

## A. The judge's replacement of Juror #88 violated Laffitte's right to a unanimous and impartial jury

Even in the midst of a brief that cries waiver and forfeiture on almost every other issue, the Government has conceded that Laffitte's claim that "the court violated his Sixth Amendment right to a unanimous verdict" as to Juror #88 "is preserved." U.S. Br. 41. The Government has had no other choice but to make that concession. When the judge returned from his *in camera* interview of Juror #88 and announced that he

16

had dismissed her, Laffitte's counsel responded that they "would make an objection" and then moved for "a mistrial." JA2281-2287. The Government acknowledges that the judge told the parties at that time that during the interview he and Juror #88 "never got into what's going on in the jury room or anything like that." JA2283.

Now that the transcript is available and Juror #88's statements are known, it is impossible to see how the Government can still maintain that the judge's improper dismissal of this juror "did not violate Laffitte's Sixth Amendment rights." U.S. Br. 72. The Government does not dispute that the Sixth Amendment rule that has been followed by every circuit to have considered the matter should govern here: in light of the defendant's right to a unanimous and impartial jury, "'a court may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence.'"

17

Laffitte Br. 51 (quoting *United States v. Brown*, 823 F.2d 591, 595-96 (D.C. Cir. 1987)). Nor does the Government doubt that, under this rule, the court must deny the juror's request to be replaced so long as the record discloses at least a reasonable "'possibility that the request to discharge stems from the juror's view'" of the case. Laffitte Br. 52 (quoting *Brown*, 823 F.2d at 596; *United States v. Ozomaro*, 44 F.4th 538, 545-46 (6th Cir. 2022)). There is not even a plausible argument that this record does not satisfy this test.

The Government is wrong when it suggests that no Sixth Amendment problem arose when Juror #88 asked the judge to replace her based being ████████████████████████████ because the courts have "limited" this Sixth Amendment "test to circumstances where the juror is discharged 'for bias, failure to deliberate, failure to follow the district court's instructions, [or] jury nullification.'" U.S. Br. 67 (quoting *United States v. Kemp*, 500 F.3d 257, 304 (3d Cir. 2007)). The Government is selectively quoting those decisions, and that is not what they say. Those courts have simply held that, notwithstanding the Sixth Amendment right to a unanimous and impartial jury, a judge **still may dismiss**

18

**a juror** for the reasons the Government mentions—"bias, failure to deliberate, failure to follow the district court's instructions, or jury nullification"—if the judge also determines that "there is no reasonable possibility that the allegations of misconduct stem from the juror's view of the evidence." *Kemp,* 500 F.3d at 304. Not one of those courts has even remotely suggested that the Sixth Amendment allows a judge to replace a juror when the record unambiguously discloses, as the *in camera* interview transcript does here,

This juror's statements sharply triggered the Sixth Amendment rule.

The Government also has no serious argument that the district court's actions did not implicate Laffitte's rights because "at no point" during her *in camera* interview "did Juror 88 indicate her request stemmed from her **doubts** about the government's case." U.S. Br. 73.

But that is obviously not what happened, and a judge's obligation to deny a juror's request is not contingent on his ability to ascertain whether that juror favors the prosecution or the defense. The judge's obligation instead arises so long as the record discloses a reasonable or substantial **possibility** that the juror's request stems from her disagreement with the Government's case. *See* Laffitte Br. 52.

The remainder of the Government's argument borders on the inexplicable. The Government recites a principle of law that is no doubt correct—namely, that the Sixth Amendment does not "'stand in the way of dismissing [even] a known holdout juror for reasons independent of his views about the evidence.'" U.S. Br. 68 (quoting *United States v. McGill,*

20

815 F.3d 846, 868 (D.C. Cir. 2016)). But the Government then repeatedly urges this Court to apply this principle in a way that is undoubtedly wrong—arguing that no Sixth Amendment violation occurred because Juror #88's request to be dismissed "was unrelated" to her "views of the evidence." U.S. Br. 72. The Government doesn't just say this once. It repeats two pages later that Juror #88's anxiety was an "independent and justified basis for excusing" her. U.S. Br. 74. It insists in the same breath that "there was no 'causal link' between . . . Juror 88's view of the evidence and her dismissal." U.S. Br. 74. On the next page, it claims once more that "Juror 88's extreme anxiety justified her dismissal wholly independent of her views of the evidence." U.S. Br. 75.

But repetition is no substitute for the truth, and invoking terms from the case law like "unrelated" and "independent" over and over again does not change what this juror told this judge. The record says what it says, and the Government never addresses the transcript or explains how it can support its position that Juror #88's anxiety had no relationship to her views about whether Laffitte was innocent or guilty.

21

The record makes unfortunately clear that the district court did "exactly what it said it would not—allow a dissenting juror to be bumped off the jury based on her views." U.S. Br. 74. There is no need to further belabor the point.

The Government's insistence that this violation of Laffitte's Sixth Amendment rights was "harmless beyond a reasonable doubt" cannot be taken seriously. U.S. Br. 75.

Less than an hour after he dismissed her outside the presence of Laffitte and his lawyers, the reconstituted jury's guilty verdict came down. The point is not, as the trial judge suggested and the Government says now, that some "'minimum time'" was "'required for jury deliberations.'" U.S. Br. 71 (quoting JA2415).

The Government's professed belief that "overwhelming evidence supported Laffitte's guilt" is not the relevant data point for the harmless-error analysis. U.S. Br. 64.

The Sixth Amendment violation that prompted her removal was the opposite of harmless beyond a reasonable doubt.

## B.    The judge's replacement of Juror #88 also violated Laffitte's right to be present at all stages of trial

The judge's actions also were reversible error because they violated Laffitte's Fifth Amendment right to be present during this trial. The Government's response rises and falls on a critical, flawed assumption: that "everyone agreed" beforehand that the judge could dismiss Juror #88 during the *in camera* interview, such that "Laffitte and his counsel" either "**were** present when the court considered whether to relieve and replace Juror 88" or "waive[d]" their right to be there when the replacement later occurred. U.S. Br. 63, 65. These assertions cannot be squared with this record, which the Government repeatedly tries to rewrite. The record is clear that the judge stated, "Do I have the consent of the parties for me **creating a record to question the juror**?" JA2279 (emphasis added). The Government at trial understood what the judge was proposing to do, for it responded, "Yes, as long as it's on the record, we have no objection." JA2279. Laffitte's counsel also responded, "Yes, you do have the consent."

23

JA2279. Thereafter, as the judge was preparing to leave the courtroom, without receiving a response from the Government or Laffitte's counsel, the judge stated, "I'm going to take action." JA2281.

The Government now repeatedly insists that the judge said something different. Rewriting his five-word sentence, "I'm going to take action," it represents that the judge proposed "to question Juror 88 *in camera* and 'take action' on her request to be replaced." U.S. Br. 45. It repeats the misrepresentation eight pages later, asserting that "defense counsel had plainly agreed to the *in camera* questioning of the juror and for the Court to 'take action' on the juror's request to be replaced." U.S. Br. 53 (quoting JA2410). Ten pages later, the Government again mischaracterizes the record, claiming it shows that "the court told the parties that it was going to question Juror 88 *in camera* and 'take action' on her request to be replaced." U.S. Br. 63. Twelve pages thereafter, the Government goes so far as to accuse Laffitte of "sandbagging" because "all parties had agreed" that the judge would "'t[ake] action' on her request to be replaced." U.S. Br. 75.

That is not what the record says. The trial transcript clearly demonstrates the judge obtaining, in his words, "the consent of the parties for

24

me creating a record **to question the juror**" outside their presence, not their consent that she be **replaced**. JA2279 (emphasis added). No matter how many times the Government's mantra "take action" gets repeated, it is not the longer phrase, "'take action' on the juror's request to be replaced," that the judge later used to justify what happened and that the Government co-opts now. *See* U.S. Br. 29, 45, 52, 53 (twice), 54, 55, 63, 75.

The Government cannot genuinely believe that the judge obtained Laffitte's consent to replace Juror #88 outside his presence on the theory that, during the colloquy that occurred in the courtroom immediately before the *in camera* interview, Laffitte had "asked no questions, requested no clarification, and expressed no confusion." U.S. Br. 55. Laffitte had no need to ask any questions or request any clarification because the judge had generated no confusion about what the parties had authorized him to do: "creating," in his words, "a record to question the juror." JA2279. Nothing more, nothing less. The Government does not deny that "'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and . . . 'do not presume acquiescence in the loss of fundamental rights.'" *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The

Government has no reasonable argument that this colloquy between court and counsel overcame this presumption and manifested Laffitte's consent to forsake his right to be present when the judge made the decision whether Juror #88 would be replaced. On this issue, too, the record says what it says, and there is no need to further belabor the point.

The Government also has no basis for its argument in the alternative that, even if it is wrong and Laffitte did not agree ahead of time that the judge could dismiss Juror #88, he still should be deemed to have "forfeited" his right to be present because "when he did object," after the judge announced his decision, counsel did not specifically say "he had a right to be present when Juror 88 was questioned and excused." U.S. Br. 63. It is unclear how the Government could even conceivably read the record that way. When Laffitte's counsel raised their objection, they told the judge, "We thought you were coming back to tell us what the juror said or to give us what your decision would be so that we could object to it." JA2286. That statement was more than "'sufficient'" to "'alert the district court'" that one "'ground for the objection'" was that Laffitte should have been present when the judge's decision was made. U.S. Br. 63 (quoting *United States v. Elbaz*, 52 F.4th 593, 611 (4th Cir. 2022)).

The Government ignores the purpose of this right when it contends that its violation was "harmless beyond a reasonable doubt." U.S. Br. 65. The Government expresses false confidence that Laffitte's presence "would not have changed the outcome" because the judge was emphatic in reporting, after the fact, that Juror #88 "'was emotionally incapable of functioning and she asked me again to remove her.'" U.S. Br. 65-66 (quoting JA2286). If Laffitte had been present at a proceeding at which, as counsel put it, the judge "g[a]ve us what your decision would be" and an opportunity to "object," the judge also would have told them, as counsel also put it, "what the juror said." JA2286. Counsel would have learned

JA3310. Counsel could have pointed to the principle that "a court may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence." *Brown*, 823 F.2d at 596. Counsel could have advised that this principle required the judge to deny Juror #88's request and to instruct the jurors to conduct their deliberations with respect for their fellow jurors' opinions.

27

The purpose of the right to be present is to ensure that the "adversary process" in the criminal-justice system is "fair." *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975). The adversary process's fundamental assumption is that when the presence of the defendant and his counsel brings facts and legal principles to the judge's attention that require a ruling for the defendant, the judge will rule in accordance with the law. So the Government has no meritorious argument that, even if Laffitte and his counsel had been present and allowed to inform the judge of the principles that precluded Juror #88's dismissal, the judge still "would have removed" her from the jury. U.S. Br. 66.

Nor does the Government have any meritorious argument that this Court's decision in *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013), suggests that this Fifth Amendment violation "did not affect Laffitte's substantial rights." U.S. Br. 64. This Court in *Runyon* noted that "[h]ad there been any risk of prejudice from the" judge's replacement of the juror at issue there, "one would have expected Runyon's lawyer to have vigorously objected" when "the district court announced its decision"—something, in contrast, Laffitte's counsel vigorously did. *Runyon*, 707 F.3d at

28

518. Even more critically, the judge in *Runyon* replaced that juror "during a hiatus in the proceedings—after the jury had found Runyon guilty but before it had even begun to hear evidence as to what sentence he should receive." *Id.* Far from removing a deliberating juror �altered—like Juror #88 here—the judge in Runyon's case had removed a juror who had already declared him guilty beyond a reasonable doubt. As to a second juror, the judge in Runyon had held "a hearing in open court" and excused her "with the agreement of both the prosecution and" the defense. *Id.*

This violation of Laffitte's Fifth Amendment rights, in contrast, caused the district court to dismiss a juror ▬▬▬. JA3310. Laffitte objected as soon as he learned what happened, and a guilty verdict followed less than an hour later. Like the Sixth Amendment violation that accompanied this juror's dismissal, this Fifth Amendment violation was the opposite of harmless beyond a reasonable doubt.

## II. The district court erred when it replaced Juror #93, whose notes said she needed an antibiotic and was feeling "pressured to change my vote"

The second ruling Laffitte challenges is the judge's dismissal of Juror #93, which Laffitte's opening brief explained "stands as an independent reason to reverse." Laffitte Br. 57. The Government's brief also has muddied the waters on this point, consolidating its argument on Juror #93 with its argument on Juror #88 and repeatedly shifting back and forth between the two. *See* U.S. Br. 44-46 (argument on both Juror #93 and Juror #88); U.S. Br. 47-51 (argument on Juror #93 exclusively); U.S. Br. 52-56 (argument on Juror #88 exclusively); U.S. Br. 56-61 (back to both jurors); U.S. Br. 62 (back to Juror #93 exclusively); U.S. Br. 63-66 (back to Juror #88); U.S. Br. 69-72 (Juror #93); U.S. Br. 72-75 (Juror #88). But the issues presented by the judge's decisions on these jurors' respective dismissals are distinct.

Most critically, the analysis of Juror #93 raises preservation and evidentiary questions that the analysis of Juror #88 does not. Whereas Laffitte's counsel "object[ed]" to Juror #88's removal as soon as the judge announced it, counsel simultaneously represented that they "'agreed with'" Juror #93's removal "'at the time.'" Laffitte Br. 57 (quoting

30

JA2283). Both the district court and Government deemed that statement a "waiver" of Laffitte's rights as to Juror #93, and Laffitte has responded that any waiver was not "knowing" and therefore not effective. Laffitte Br. 62.

So whereas it is unnecessary for the Court to consider juror affidavits when resolving the issues arising from Juror #88's removal, the affidavit of Juror #93 plays a critical role in the analysis of the judge's dismissal of her. The Government has contested the admissibility of all the juror affidavits as a threshold matter, so this section of the Reply will respond to the Government's evidentiary arguments before turning to preservation and the merits.

## A.    The testimony of Juror #93 on these matters is admissible

31

32





34



34



35











## B. The judge's replacement of Juror #93 was error that independently requires reversal

Because the Government cannot hide the pertinent aspects of Juror #93's affidavit from view, it has no adequate defense of the judge's dismissal of her. Defense counsel's statement that "we agreed" with the decision "at the time" was not an accurate recounting of what counsel had said earlier in the proceedings, and it could not have effectuated his client's "knowing" relinquishment of his rights in light of the facts Juror #93's affidavit exposed. *Brady*, 397 U.S. at 748. When counsel made that statement, the judge had told the parties that "we need to send" Juror #93 "home" because "[s]he needs her medicine." JA2277.

40

Counsel could not have remedied his lack of knowledge on that point, as the Government now suggests, by "ask[ing] the court whether it was possible to have her medicine brought to her so she could continue deliberating." U.S. Br. 51. When counsel made that statement that he "agreed" with the judge's decision, the judge had already sent Juror #93 home.

The judge's decision to dismiss her, as Laffitte explained in his opening brief, was plain error "in three different respects." Laffitte Br. 64. The Government has no adequate response on any of these fronts.

1. As an initial matter, the Government has no basis for suggesting that Juror #93 was "unable to perform" her "duties" and thus properly replaced under Federal Rule of Criminal Procedure 24(c). This case is nothing like this Court's decision in *Runyon*, in which the judge "confirmed that" the juror's "mother had actually died" before dismissing her. 707 F.3d at 517. While the Government asserts that the judge "conclude[d] it was impractical for" Juror #93 "to get her medicine," the record contains no evidence that he ever met with her or spoke to her about any

41

matter at any time. U.S. Br. 59.

The Government cannot seriously maintain that the few minutes it would have taken her "to get her phone" from her car "outside the courthouse" rendered her unable to perform and thus removable under Rule 24(c). U.S. Br. 59. It was already 7:43 p.m. when he read from her note in the courtroom, so the judge alternatively could have addressed her need for medication by sending the jurors home and bringing them back the next day. *See* JA2270. The Government blinks reality when it suggests that doing so might have improperly "push[ed] the jury to a verdict." U.S. Br. 58. The judge dismissed these jurors and had the reconstituted jury restart its deliberations at 8:31 p.m., when they knew the courthouse was supposed to be closed the next day. *See* JA2283. Those actions pushed the jury to a verdict that very night, as evidenced by the fact that the reconstituted jury began deliberating and reached a verdict less than an hour later.

2.  Nor has the Government established that Juror #93's dismissal was consistent with Laffitte's Fifth Amendment right to be present at all critical stages of trial. The Government insists that "'[t]he full discussion

42

and plan agreed to for the replacement of Juror No. 93' took place in Laffitte's presence." U.S. Br. 62 (quoting JA2408). But it is quoting the district court's post-judgment order for that proposition, and the trial transcript reflects no such discussion and plan. The Government's own recitation of the facts shows that the judge originally obtained counsel's consent to question only the subject of the third note: the juror the Government now describes as "potentially refus[ing] to follow the law." U.S. Br. 28. At the Government's suggestion, the judge then extended the plan to "the juror who's reporting being anxious.'" U.S. Br. 28 (quoting JA2279). The record shows no exchange in which the Government asked the judge to also include the juror who said she needed her antibiotic and was feeling pressured to change her vote.

The Government's statements during that colloquy suggest that the judge's announced plans did not fully address even its own understanding of the diverse concerns these notes had raised about a number of different jurors. So its current proclamation that "[t]he record is clear" that Laffitte personally waived his constitutional rights as to Juror #93—be-

43

cause he was "'sitting at counsel table'" and is a "'sophisticated business-man'"—needs to be taken with a grain of salt. U.S. Br. 50 (quoting JA2413).

3.   Nor, in light of her second note telling the judge that she was "feeling pressured to change my vote," can the Government square the discharge of Juror #93 with Laffitte's Sixth Amendment right to an impartial and unanimous jury. JA2271. The Government maintains that the Sixth Amendment was not implicated because Juror #93 was "excused" not based on her views of the merits, but due to the "need" for the antibiotic she expressed in her first note. U.S. Br. 71. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ The judge read the two notes to the parties at the same time, explaining that they were from the "[s]ame juror." JA2272. The notes' proximity gave rise to the requisite substantial possibility that her communications, taken as a whole, were designed to draw an audience with the judge where she could express these concerns.

44

The Government does not deny, as Laffitte's opening brief explained, that— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮—the juror notes and sequence of events in this case demonstrate that Juror #93 ▮▮▮▮▮▮▮▮ had been a "holdout" to acquit. Laffitte Br. 65. The judge's error in dismissing her—whether because it violated Federal Rule of Criminal Procedure 24, the Fifth Amendment right to be present, or the Sixth Amendment right to an impartial and unanimous jury—changed the outcome of this trial and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993). This error requires reversal as well.

## III. The district court erred when it excluded evidence demonstrating Government witnesses' bias

The Government's obfuscation does not stop when its brief moves beyond the judge's replacement of the jurors. To address the district court's erroneous exclusion of bias-related evidence, which Laffitte's opening brief covered over three-and-a-half pages, the Government offers a response that is four times as long. *Compare* Laffitte Br. 66-69, *with*

U.S. Br. 76-90. But the issue is not nearly as complicated as the Government wants it to be.

Rather than opening with a full-throated defense of the district court's decision on the merits, the Government starts with another averment of waiver, this time on the theory that "Laffitte did not sufficiently proffer the anticipated testimony." U.S. Br. 77. But Rule 103(a) requires only that counsel "inform[] the court" of the "substance" of the excluded evidence, and defense counsel informed the court of this testimony's substance throughout this trial. FED. R. EVID. 103(a)(2).

Counsel made this requisite offer of proof even though the judge, in his efforts to move this trial toward a conclusion, afforded them few opportunities to do so. Counsel first informed the court of the substance of this testimony in response to the Government's objection to a question about a stock-repurchase plan, stating that a "major part of our defense, Judge, is there's a split amongst Board members" because "a bunch of new Board members, family members that came in, and they started moving towards trying to sell the bank." JA1556. The judge asked, "Why is that relevant to whether the defendant committed wire fraud?" JA1556-1557. Counsel barely started to answer—he was able to get out

46

only "In order to testify --"—when the judge interrupted, stating, "You can impeach" but "[y]ou can't use extrinsic evidence to impeach." JA1557. When counsel then attempted to explain these matters' relevance, the judge interrupted again, allowing counsel to get out a sentence-and-a-half in that instance before reiterating that "the rule is you can't prove impeachment evidence by extrinsic evidence." JA1557.

When the Government objected a few minutes later to counsel's question about a 2020 Board retreat, the judge asked, "Is this the same issue?" JA1561. Counsel responded affirmatively. JA1561. The judge then immediately sustained the government's objection, explaining, "I think I've ruled on this." JA1561. He warned counsel, "Don't do it again." JA1561.

The judge provided more time for counsel to make their proffer at a later point in the trial, but even then he peppered them with interruptions for which the Government cannot blame Laffitte. The judge began this session by saying that his experience "from 40 years of practicing" was that "you can't try to prove that issue which is the subject of im-peachment by extrinsic evidence." JA1676. Defense counsel responded that whereas the judge was "talking about credibility for truthfulness,"

they were "talking about bias and motive for testifying," and the "Fourth Circuit has split those two issues." JA1676. When the judge asked counsel to name "a specific witness by name," counsel responded, "Norris Laffitte, Lucius Laffitte." JA1678. The judge then immediately asked, "What about Norris Laffitte's testimony goes to bias?" JA1678. Counsel responded, "as he took on his role at the bank, wanting to sell the bank goes to his motivation for then wanting to testify against Mr. Laffitte." JA1678.

The judge then spoke at length about his various "concern[s]" about "the issue that you are trying to use," saying they raised "401 issues, 403 issues, as well as 608(b) issues," and added, "your lack of particularity is troubling to me." JA1678. The next page of the transcript documents a back-and-forth between counsel and the judge in response to the judge's question, "what is it about Lucius or Norris Laffitte's testimony, specifically, that you think is produced by bias?" JA1679. Counsel started to offer examples. They first cited the Board's "rush to judgment" about Laffitte's actions and the directors' testimony condemning "the 680,000" settlement Laffitte had offered Murdaugh's law firm. JA1679. Even though "there was information provided to the Board in the executive

48

session about the 680," counsel told the judge, "[n]obody says a single word about it." JA1680. The judge then cut counsel off, stating that "all these people have described these various events," and "I think you are just, you know, just dressing it up and calling it motive." JA1680. The judge concluded, among other things, that "[t]his is classic impeachment evidence" that is "irrelevant to the case," and reiterated, "you are trying to prove it by extrinsic evidence." JA1680.

Even if the Government somehow could have reasonably maintained that all of counsel's efforts up to that point were insufficient, that position would become unsustainable in light of the way this colloquy ended. At that time defense counsel also added the memorandum authored by Laffitte's father to the offer of proof, explaining that "there was a Board retreat, which we were going to go into, but the Court had already ruled that we couldn't have that—we couldn't discuss that issue." JA1684. Counsel explained the memo's contents: "10 days after" the retreat, Laffitte's father wrote the "memo to the Board, including all those Board members here," documenting that four of them had opined during a "strategic planning session" that they should get "ready to sell" in either five or ten years. JA1685. Counsel told the court that the memo "says to

49

the Board" that the directors should be "team players as to the strategy of the bank as described in our mission statement." JA1685. Counsel explained that the "mission statement" was "about a locally owned bank." JA1686. The judge responded that his ruling was that the memo was "trying to prove -- impeach by extrinsic evidence," "irrelevant," and "would produce jury confusion." JA1686.

Even the Government concedes that counsel's proffer of the memo was "sufficient to preserve the issue under Rule 103(a)(2)" as to the memo itself. U.S. Br. 80. But counsel's statements and the sequence of events made the "substance" of **all** the excluded evidence apparent. FED. R. EVID. 103(a)(2). Counsel offered sufficient explanations within the confines the judge allowed during a pressure-filled trial, and the judge "rule[d] definitively" on the objections they had raised. FED. R. EVID. 103(b).

The judge's rulings, in turn, were definitively wrong. As counsel argued below and Laffitte has reiterated here, the judge's refrain that "'you can't be impeaching with extrinsic evidence'" was contrary to established precedent allowing defendants to use extrinsic evidence to "'prov[e] bias.'" Laffitte Br. 67 (quoting JA1557; *Quinn v. Haynes*, 234 F.3d 837, 845 (4th Cir. 2000)). The Government is engaging in revisionist history when it

50

contends that "[a]fter defense counsel argued the evidence was meant to show bias," the court's analysis "changed." U.S. Br. 82. When the judge excluded the proffered testimony at that time, he reasoned, "[t]his is classic impeachment" and "you are trying to prove it by extrinsic evidence." JA1680. When the judge then excluded the proffered memo, he again reasoned, "trying to prove -- impeach by extrinsic evidence." JA1686. The judge did not alter his position on this point.

The Government tries to paper over the problem by claiming that the district court had in fact ruled that the proffered testimony did not "establish any bias or motive to lie on the part of any of the Government's witnesses." U.S. Br. 82. But that is not a sustainable reading of the record. Counsel told the judge that the evidence would show "a split amongst Board members" because "a bunch of new Board members, family members that came in, and they started moving towards trying to sell the bank." JA1556. Counsel had explained that the memo documented four directors—in contravention of Laffitte's father's beliefs about the bank's future—expressing a desire to sell within the next five to ten years. *See* JA1684-1686. Four directors, in turn, had testified against Laffitte. The

51

"substance" of the excluded evidence of bias was, at the very least, "apparent from the context." FED. R. EVID. 103(a)(2). Contrary to the Government's suggestion, Laffitte's "theory of admissibility" of this evidence has remained constant "at trial," in the "post-trial briefing," and "on appeal." U.S. Br. 83-84.

The Government concedes that "a witness's bias is 'always relevant,'" and its defense of the judge's additional ruling under Federal Rule of Evidence 403 falls flat. U.S. Br. 86 (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). The Government's case-in-chief consisted of, as it admits, "15 witnesses and 222 exhibits." U.S. Br. 3. The Government chose, during a two-week trial, to call all four of the Board members who had voted to remove Laffitte as CEO. *See* Laffitte Br. 17 (citing JA368; JA682-684; JA1092-1093; JA1164-1165). The Government also chose, during its examination of those witnesses, to ask each of them why they made that decision. Having made all those strategic choices, the Government cannot now maintain that allowing this defendant to present this evidence of these witnesses' bias, through testimony and evidence he elicited in his own defense, "'would have necessitated an exhaustive case within a case

that would have confused the jury as to the issues to be decided.'" U.S. Br. 87 (quoting *United States v. Hill,* 322 F.3d 301, 306 (4th Cir. 2003)).

The Government's willingness to use even the weakest arrows in its quiver is evident from its resort to hearsay and authentication arguments as to the memo, which the district court did not rely on and that the Government did not even raise below. *See* U.S. Br. 80. It is far too late for the Government to object on these grounds now. The parties, of course, can stipulate that a document is authentic and waive hearsay objections to it, and the Government's failure to raise those grounds in the proceedings below would have had that effect. But if the Government had maintained in the district court that the memo had not been authenticated, then Laffitte could have addressed the issue by providing the requisite authentication—either by re-calling Charlie Laffitte to the stand or calling another witness who was familiar with the document. Likewise, if the Government had maintained in the district court that the memo was inadmissible hearsay, Laffitte could have addressed the issue by providing evidence that the document fell within any number of the exceptions to the hearsay rule. *See, e.g.,* FED. R. EVID. 803(6) (business records). But the Government did not raise any of those issues in the district court, and

53

it cannot raise them at a time when Laffitte cannot address them in those ways. The Government will be free to pursue those objections, if it wishes, when this case is retried.

The Government would not have gone to such lengths to keep this evidence out of the record if it truly believed, as it claims it does now, that it is "'highly probable that [any error] did not affect the judgment.'" U.S. Br. 87 (quoting *United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018)). Defense counsel explained to the judge that evidence of these witnesses' disagreements was a "major part of our defense." JA1556. The Government concedes that it was fair game for counsel to question the "reasons the Government's witnesses had for testifying." U.S. Br. 89. These board members' financial incentives to usher Laffitte out the door supplied a far more compelling inference of bias than anything the judge allowed counsel to discuss in front of the jury.

In arguing harmless error throughout its brief and again on this evidentiary ruling, the Government has insisted that the jury had "overwhelming evidence" of Laffitte's guilt. U.S. Br. 37, 64, 88, 90, 96. But that assertion does not correspond with other, more realistic arguments the

54

Government offers elsewhere in its brief. As the Government admits, "after two days of Laffitte's testimony and nearly 10 hours of deliberation, (which included the jury asking to rehear Laffitte's testimony and one of his exhibits, JA2266-2267; JA2269), defense counsel could reasonably have estimated that the jury was moving toward an acquittal." U.S. Br. 48. The record provides ample support for that assessment ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. JA2271; JA2273. Every bit of evidence mattered in this case. The Government cannot reasonably maintain that this evidence's exclusion was harmless beyond a reasonable doubt.

## IV.    The district court erred when it denied Laffitte's motion for judgment of acquittal on Counts 2 and 3

Nowhere are the Government's efforts to garble and blur more pronounced than in its treatment of the fourth and final issue in Laffitte's appeal. In four and a half pages of his opening brief, Laffitte explained why a judgment of acquittal was appropriate on Count 2 and 3 on a narrow ground: "[n]o rational trier of fact could have found these crimes' es-

55

sential elements beyond a reasonable doubt because there was no evidence that Laffitte committed a 'fraud' relating to" the two transactions on which the Government premised those counts. Laffitte Br. 70. The Government's response is three times as long but pays scant attention to this point. *See* U.S. Br. 90-104.

The Government does make one comment at the outset of its analysis that is so obviously wrong that it may not even warrant a response, but it will be addressed here to make the record clear. The Government has repeatedly—and misleadingly—stated that by seeking a judgment of acquittal only on Counts 2 and 3, Laffitte "has not appealed" any of the other convictions. U.S. Br. 37, 91, 97; *see also* U.S. Br. 64 n.14 ("Laffitte did not challenge the other four counts on appeal."). It is unclear what would possess the Government to make that representation. Laffitte has appealed the entire judgment, and has sought, in his words, "a new trial" on any count for which the Court does not "enter a judgment of acquittal." Laffitte Br. 74. He thus maintains his innocence on all counts and will seek an acquittal on each of them when a new trial is held. Counts 2 and 3 are the ones on which the evidence is so lacking that, as Laffitte explained in his opening brief, they cannot even be submitted to a jury. *See*

56

Laffitte Br. 70 (citing *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020)).

The first half of the Government's treatment of the judgment-of-acquittal issue is not remotely responsive to the argument Laffitte has made. The Government contends that the jury also convicted Laffitte of being "an aider and abetter" and asserts that Laffitte "has not appealed his aiding and abetting convictions." U.S. Br. 91. The Government then offers a lengthy recitation of evidence that reads like a closing argument, much of which has nothing to do with either of the transactions on which Counts 2 and 3 were premised. *See* U.S. Br. 91-98. It concludes that "it proved Laffitte aided and abetted Murdaugh in committing bank and wire fraud." U.S. Br. 98. There are three insurmountable problems with the Government's theory on this front.

The first is that there were no separate "aiding and abetting con-victions." U.S. Br. 91. The jury simply convicted Laffitte on the counts that were alleged in the indictment. *See* JA2640; DE209. Laffitte has sought a judgment of acquittal on both Counts 2 and 3.

The second is that the Government has not relied on this theory when it has opposed Laffitte's requests for judgments of acquittal in the

57

past. When Laffitte made his motion at trial, the Government responded that he had engaged in "false pretenses" through "his role as the personal representative for the estate of Donna Badger"—not that the evidence was sufficient on aiding and abetting instead. JA1475. When Laffitte filed his post-trial motion, the Government marched through the elements of both crimes and argued that "Defendant's false and fraudulent pretenses and misrepresentations were the means by which he obtained the funds"—and, again, did not mention aiding and abetting. *See* JA2380-2385. Having failed to offer this theory in the district court, the Government cannot do so now. As another court has explained, an "appellate theory" of guilt pressed by the Government cannot be used to defend a conviction obtained at a trial unless it was "part of a coherent theory of guilt that, upon **reviewing the principal stages of trial**, can be characterized as having been presented [at trial] in a focused or otherwise cognizable sense." *Cola v. Reardon*, 787 F.2d 681, 693 (1st Cir. 1986) (emphasis added) (citing *Dunn v. United States*, 442 U.S. 100, 106-07 (1979)).

Third and most important, even though the Government devotes eight pages to its discussion of evidence relating to its aiding-and-abet-

ting theory, it never addresses the deficiency on which Laffitte's judgment-of-acquittal argument is focused. Nowhere in that recitation does the Government explain how Murdaugh's $101,369.49 and $33,789.83 withdrawals from Badger's settlement funds in late 2013 resulted from "fraud" as opposed to "theft." Laffitte Br. 71-72 (citing 18 U.S.C. § 1343; 18 U.S.C. § 1344(2)). The Government's recitation, which describes numerous transactions going back two years, says almost nothing about those two checks. *See* U.S. Br. 91-98.

The Government fares no better when it reverts to the theory on which it has previously based its defense of Laffitte's requests for judgments of acquittal on these counts—namely, that "there was sufficient evidence for the jury to find he committed bank and wire fraud as a principal." U.S. Br. 98. The Government concedes that to support this theory it must point to evidence that "the $101,369.49 and $33,789.83 transactions" were induced by Laffitte's "misrepresentations" or "[]fraud," and it proposes that a reasonable juror could find that Laffitte made two "misrepresentations" that had that effect. U.S. Br. 99 & n.20. Neither argument works.

59

The Government's first argument is that Laffitte induced the transactions by making a "misrepresentation that he had authority to direct disbursement of" what the Government calls "the Badger settlement funds." U.S. Br. 100. But the record contains no evidence that Laffitte either made a "misrepresentation" along those lines or that such a "misrepresentation" induced Murdaugh's firm to issue those checks. Laffitte was, in fact, the personal representative for the estate of Donna Badger, so any representation he made as to his authority to direct disbursement of her estate's assets would not have been a "misrepresentation." *See* JA488-489. The Government does not cite any evidence, moreover, that Laffitte induced Murdaugh's firm to issue the $101,369.49 and $33,789.83 checks by representing that he was personal representative for James Badger. The Government does not cite any evidence that Laffitte was even involved in the firm's issuance of those checks. In contending that Laffitte made a "misrepresentation" along these lines, the Government references not those checks, but "the $1,325,000 settlement check" that Murdaugh had his firm "recut" into four smaller checks in the earlier part of 2013. U.S. Br. 100. Neither the $101,369.49 check nor

60

the $33,789.83 check was one of those four checks. *See* Laffitte Br. 13 (citing JA3297).

The Government's second argument is that "every time he negotiated a check involving stolen settlement funds, he misrepresented to the bank that the money belonged to Murdaugh." U.S. Br. 102. The Government has not raised that argument in response to Laffitte's motion for judgment of acquittal before, and the Government did not make this argument to the jury. *See* JA2127-2131 (closing argument); JA2380-2385 (opposition to motion for judgment of acquittal). It is far too late for the Government to come forward with this argument for the first time now. *See Cola*, 787 F.2d at 693; *see also Chiarella v. United States*, 445 U.S. 222, 237 n.21 (1980) ("We may not uphold a criminal conviction if it is impossible to ascertain whether the defendant has been punished for noncriminal conduct.").

The Government's new theory of "misrepresentation" is outlandish in any event. The Government cites no precedent that even remotely suggests that a bank officer's negotiation of a customer's check, drawn on the customer's account and at the customer's request, can somehow constitute a "misrepresentation" to the bank that the money belongs to that

61

customer. The Government's decision to raise this novel theory for the first time on appeal speaks volumes about the weaknesses of its case and the lengths to which it will go to pursue these charges against this defendant no matter what justice may otherwise require.

## V.      The cross-appeal is meritless and moot

Hypocrisy is the dominant theme in the Government's cross-appeal. It is hard to understand how, in a brief that asserts on its final page that "[n]early all" of this defendant's constitutional "claims are either waived or forfeited," U.S. Br. 111, the Government can justify cross-appealing a ruling it concedes it "did not object to" below, U.S. Br. 104. It is even harder to understand how, in a case in which the Government feels comfortable defending convictions it secured after the judge excused these two jurors ████████████████████████████████, the Government can maintain that it is somehow the district court's waiver of interest on restitution, of all things, that has "seriously affect[ed] the integrity of" these "judicial proceedings," U.S. Br. 109. The Court should deem this cross-appeal moot when it reverses Laffitte's convictions and remands this case for a new trial, but the cross-appeal is meritless in any event.

62

The Government concedes that its cross-appeal is subject to "review" only for "plain error," but the record does not reveal any error, plain or otherwise, on this restitution issue. U.S. Br. 104. The Government rests its cross-appeal on two contentions: that "'[i]nterest may be waived only if the court first 'determines that the defendant does not have the ability to pay interest'"; and that, in the Government's words, the district "court did not make the required finding in Laffitte's case." U.S. Br. 105 (quoting 18 U.S.C. § 3612(f)(3)). The second contention is plainly false. The district court's judgment states that "[t]he court determined that the defendant does not have the ability to pay interest." JA2644. Other than to briefly concede that the district court made that "finding" when "it issued" the judgment, the Government never says anything about it. U.S. Br. 106. The Government offers no reason why a finding in the judgment would not be sufficient as a procedural matter, and none is apparent.

Nor does the record support the Government's argument that "the district court could not have reasonably found Laffitte is unable to pay interest." U.S. Br. 108. The district court adopted the PSR's finding that

██████████████████████████a conclusion the Government does not contest. JA2847████████. Meanwhile, the record does not come close to compelling the conclusion that, as the Government suggests, Laffitte's "assets and liabilities would weigh in favor of a finding that he could also pay restitution interest." U.S. Br. 107. ████████████████████

████████████████████████████

██████████████████████████ The judge agreed at sentencing that Laffitte would be entitled to use some of his assets to pursue his legal defense and appeal. *See supra* at 9-10 (citing JA2857). ████████

████████████████████████████

████████████████████████████

████████████████████████████

██████████████████████████ The district court's conclusion that "the defendant does not have the ability to pay interest" is not even close to plain error on these facts. JA2644.

As perplexing as the Government's claim of error is, it is not even the most baffling statement the Government makes when pursuing its cross-appeal. Because the Government concedes that plain-error review applies, it also must concede that, to prevail, it would need to show that

the district court's waiver of interest on restitution "seriously affects the fairness, integrity, and public reputation of judicial proceedings." U.S. Br. 109. Coming as it does after more than 100 pages of argument seeking to foreclose review of an imprisoned defendant's serious claims of violations of his constitutional rights, it borders on ridiculous for the Government to announce that it alone can pass the *Olano* test. It does not even come close.

## CONCLUSION

These guilty verdicts would not have been returned had it not been for these violations of Laffitte's fundamental rights. The Court should reverse all the convictions, enter a judgment of acquittal on Counts 2 and 3, and order a new trial on the remaining counts.

Respectfully submitted,

s/ William W. Wilkins

*One of the Attorneys for*
*Defendant-Appellant*
*Russell Lucius Laffitte*

65

**OF COUNSEL:**

Mark C. Moore
Michael A. Parente
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Phone: 803.771.8900
mmoore@maynardnexsen.com
mparente@maynardnexsen.com

William W. Wilkins
MAYNARD NEXSEN PC
104 S. Main Street, Suite 900
Greenville, SC 29601
Phone: 864.370.2211
bwilkins@maynardnexsen.com

John C. Neiman, Jr.
MAYNARD NEXSEN PC
1901 Sixth Avenue N., Suite 1700
Birmingham, AL 35203
Phone: 205.254.1000
jneiman@maynardnexsen.com

66

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable type-volume limitation. According to the word-count feature in Microsoft Word 2016, the relevant parts of this brief contain 12,815 words. With the additional 76 words in the screenshots on pages 38-39, the total is 12,891, which is within the limit of 13,000 established by the Federal Rules of Appellate Procedure for a Response and Reply Brief in a case involving a cross-appeal.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6). I prepared this brief in Century Schoolbook font, a proportionally spaced typeface. I used 14-point type or, for headings, a larger point size.

/s/ John C. Neiman, Jr.
OF COUNSEL

## CERTIFICATE OF SERVICE

On May 10, 2024, I served the sealed version of this brief on counsel

for the United States via electronic mail at the following addresses:

Winston Holliday (Winston.Holliday@usdoj.gov)

Emily Limehouse (Emily.Limehouse@usdoj.gov)

Kathleen Stoughton (Kathleen.Stoughton@usdoj.gov)

I served the redacted version of this brief on counsel for the United States

via CM/ECF.

/s/ John C. Neiman, Jr.
OF COUNSEL
